<strong>UNITED STATES DISTRICT COURT<br/>FOR THE DISTRICT OF IDAHO</strong>

| | |
|---|---|
| ROBERT HENRY WELIEVER<br><br>     Plaintiff,<br><br>vs.<br><br>CASSIA COUNTY SHERIFF<br>HEWARD AND MCCJC<br>ADMINISTRATOR DARWIN<br>JOHNSON,<br><br>     Defendants. | Case No.4:14-cv-00302-REB<br><br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendant Darwin Johnson's Motion for Summary Judgment. (Dkt. 80). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. (Dkt. 32). The parties have adequately presented the facts and legal arguments in the briefs and record and the Court finds that a decision would not be aided by oral argument. *See* D. Idaho L. Civ. R. 7.1(d). Therefore, having carefully reviewed the record, and otherwise being fully informed, the Court enters the following Order.

## I. BACKGROUND

This is a civil rights case involving claims for violations of 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution, as well as state-law claims. During the events giving rise to this lawsuit, Plaintiff Robert Henry Weliever

**MEMORANDUM DECISION AND ORDER - 1**

("Weliever") was incarcerated at the Mini-Cassia Criminal Justice Center (the "Jail") in Burley, Idaho. Defendant, Lieutenant Darwin Johnson ("Johnson") was the jail administrator at the Jail.

Essentially, Weliever claims violations of his Eighth Amendment rights stemming from the care he received for chronic headaches and seizures during the spring of 2014. Weliever further contends that Johnson has policy-based supervisory liability for such claims, arising from Johnson's role as jail administrator. Weliever also raises state law claims.

Weliever is currently in his early forties. He has a history of chronic migraine headaches and non-epileptic seizures dating back years. Though there is some suggestion in the medical records that the seizures may relate to boxing injuries sustained during his teenage years, the precise cause of these seizures remains unknown. (Defendant's Statement of Undisputed Facts, Dkt. 80-2 p. 8; Bell Declaration ¶ 12). When he was arrested, and for much of the relevant time frame of this lawsuit, Weliever was taking a prescription drug known as Lamotrigne, or Lamictral, to help control these seizures. (Dkt. 80-2, p. 9).

Weliever was arrested on April 12, 2014 and booked into the Jail. During the booking process, Weliever was given an extensive questionnaire regarding his medical history. He was asked, among other things, whether he had a history of seizures. He answered "no." Nevertheless, he was continuously provided with his anti-convulsant medication from the time he arrived at the Jail, including throughout the month of April,

**MEMORANDUM DECISION AND ORDER - 2**

2014, which was when he first began experiencing seizures while at the Jail. (Bell Affidavit Dtk. 80-3 at ¶ 11).

Weliever experienced headaches and seizures throughout his time at the Jail; however, his claims for deliberate indifference in how he received care focus on two discrete time frames: April 23-25, 2014 and May 9-14, 2014. (Defense Brief at p. 80-1 & (Weliever depo., Dkt. 80-12 at p. 37). The following facts are pertinent to those two time frames.

April 23-25, 2014.  Weliever's first significant medical event while at the Jail occurred early in the morning of April 23, 2014. He experienced a significant headache early in the morning that day and around 5 a.m., when a guard found him lying on the floor of the cell holding his head and moaning in pain. (Bell Aff. ¶ 12). The guards were able to get Weliever into a wheelchair and took him to the nurse's station, where he showed signs of a seizure. The guards called Debbie Bell, a nurse practitioner who oversees medical care at the Jail. Ms. Bell instructed the guards to take Weliever to the hospital emergency room, which was several blocks away. Weliever was transported to the ER, as she instructed. There, Weliever was treated for seizures, headaches, and a broken rib caused by his fall. Medical records from that visit show that he was receiving medical attention from various emergency room providers from 7:30 a.m. to 9:30 a.m. (Dkt. 80-6 at ECF p. 10-18). He was discharged at 9:50 a.m. (*Id.* at ECF p. 18). As part of his discharge, the emergency room physician prescribed additional Lamotrigine, and 800 mg of ibuprofen, to be taken three times a day. (Bell Decl. at ¶¶ 11-12; *See also,* Dkt. 80-

7 at ¶ 19; Dkt. 80-4 at ECF page 47).

Weliever also complains of the care he received upon his return to the Jail after his discharge from the hospital that morning. He contends that upon returning to the Jail, he was told that Jail policy allowed staff to administer medications only twice a day and that ibuprofen only could be dispensed in 200 mg pills. According to Weliever, because of this policy he initially did not receive the full course of ibuprofen that had been prescribed.

Two days later, in response to a complaint that Weliever made about the medications not being provided as prescribed, Lieutenant Johnson allowed him to be given 800 milligrams of ibuprofen (i.e. four pills) at each of the two daily medication calls, so that he could save some pills and take them on an as needed basis. While the record is not clear on this point, it appears that even after Johnson lifted the standard jail policy as to Weliever, Weliever still may have received a total of only 1600 milligrams of ibuprofen per day as opposed to the total of 2400 milligrams (*i.e.* 800 mg three times per day) that the doctor had ordered. (Bell Aff. ¶¶ 13-14).

<u>May 9-14, 2014.</u> On May 2, 2014, Weliever submitted several medical requests or grievances saying that he had been experiencing more tremors or seizures than usual. He also submitted grievances about his headaches and seizures on May 5 and May 7, 2014. On May 12, 2014, Weliever submitted a "medical request" indicating that he was having headaches and Nurse Bell referred him to a physician's assistant. (Johnson affidavit, Dkt. 80-7, ¶¶ 23-28). Later that same day, Weliever submitted a grievance

**MEMORANDUM DECISION AND ORDER - 4**

saying that he did not have any Tylenol or ibuprofen and asserted that he was not receiving adequate medical care.

In response, Johnson told Weliever that he was receiving medications and that he had money in his account to purchase additional over-the-counter medicines from the commissary. On May 14, Weliever submitted an appeal of this grievance, which Johnson answered by again reminding him that he had been provided with ibuprofen and Tylenol when he could not buy his own. Johnson further opined to Weliever that "maybe you should try them [i.e. medications] rather than spending your time complaining to staff." (Id. ¶ 28; See also Dkt. 80-10 at ECF p. 9). That same day, Weliever made a second appeal of this same grievance. Following that, Johnson and Weliever had a conversation about the various grievances and grievance appeals. The parties dispute the content and tenor of that conversation. Weliever alleges that Johnson was threatening to him, and told him to stop submitting "kites" (the jail term for such messages and grievances) related to headaches and seizures. (Weliever Depo., Dkt. 80-12 at p. 73). Johnson denies Weliever's characterization of the conversation, and says he did not prohibit Weliever from submitting new medical grievances or requests if Weliever continued to have seizures and migraines. Johnson says that he only told Weliever that he could not continue to submit appeals on issues that had already been grieved. (Johnson Decl. ¶ 29).

## II.  LEGAL STANDARDS

### A.    Summary Judgment Standards

Summary judgment is appropriate where a party can show that, as to a particular

claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id. at 327*.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Rather, there must be no genuine dispute as to any material fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id*. at 248. Disputes over facts that are not material to the resolution of the motion will not preclude summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that the facts material to the non-movant's claims are not disputed, and cannot support the claims that have been made. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial burden, then the burden shifts to the opposing

party to establish that a genuine dispute as to any material fact actually does exist.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The

existence of a scintilla of evidence in support of the non-moving party's position is

insufficient. Rather, "there must be evidence on which the jury could reasonably find for

the [non-moving party]." *Anderson,* 477 U.S. at 252.

### III.  ANALYSIS

Johnson makes three arguments in support of his motion to dismiss the Eighth

Amendment constitutional claims. First, he argues that there are no genuine issues of

material fact on the question of deliberate indifference. Second, Johnson argues that

Weliever failed to exhaust his administrative remedies, as required under the Prison

Litigation Reform Act ("PLRA"). Third, Johnson argues that he is entitled to qualified

immunity on the constitutional claims.

Because the Court concludes that the care provided to Weliever was

constitutionally adequate as a matter of law, it need not address Johnson's exhaustion or

qualified immunity arguments.

**A.      Substantive Eighth Amendment Law**

The Eighth Amendment to the United States Constitution protects prisoners

against cruel and unusual punishment. To state a claim under the Eighth Amendment, a

prisoner must show that he is "incarcerated under conditions posing a substantial risk of

serious harm," or that he has been deprived of "the minimal civilized measure of life's

necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). However, the Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her.").

A plaintiff asserting an Eighth Amendment claim must satisfy "both an objective standard – that the deprivation was serious enough to constitute cruel and unusual punishment – and a subjective standard – deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc). The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoner medical care claims, the Supreme Court has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In the Ninth Circuit, a "serious medical need" includes:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a

> reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

The subjective standard of deliberate indifference "entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Therefore, a prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

Hence, proof of deliberate indifference requires persuasive evidence of "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the

prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). Even so, a delay in treatment does not violate the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1059-1060. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," then there is no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

**B.    Rulings**

    **1.    Morning of April 23, 2014 (From when Weliever was found in his cell until he was discharged from the hospital).**

Weliever contends that deliberate indifference is evidenced by two circumstances during this time frame.  First, he alleges that he was forced to endure several hours of unnecessary pain during the early morning hours of April 23, 2014 because of the jail's policy of  having only "on-call" medical care providers during non-business hours. Second, he alleges jail policy at the time prohibited jail officers from distributing medications, even over-the-counter pain medications such as ibuprofen or Tylenol. The combination of those policies, Weliever argues, meant not only that he was denied medical attention but also was denied any kind of pain medication for several hours at a time when he was suffering from headaches and seizures. Such facts establish deliberate indifference, according to Weliever, and he further contends that Johnson was responsible

for these policies as the administrator of the Jail.

Supervisory liability can be established even without overt personal participation in the offensive act, "if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); See also, Initial Review Order, Dkt. 41 at p. 6. However, proof of a § 1983 claim based on a policy allegedly constitutionally deficient on its face requires Weliever to show not only that such a constitutionally deficient policy existed, but also that he suffered a constitutional deprivation due to those policies. *See Patrick v. Rivera*, No. 2:11-CV-00113-EJL, 2013 WL 2945118, at *11 (D. Idaho June 13, 2013) (holding that where there is no constitutional violation by correctional staff, there can be no municipal or policy based liability"); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of [an] individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

The facts upon which Weliever relies do not reach that threshold, as a matter of law. Weliever received prompt care for his medical needs on April 23, 2014. The medical records and the jail incident reports show that Weliever was found to be in considerable pain in his cell at approximately 5 a.m. that morning. However, nothing indicates that Johnson or any other individual at the Jail ignored that pain. After being found, Weliever was immediately taken to the nurse's station. When he began to have a

seizure, jail staff contacted Nurse Debbie Bell, who told the staff to take Weliever to the hospital. Jail staff then took Weliever to the emergency room, where he was treated for seizures, headaches, and a broken rib.

Weliever does not challenge these facts.  He does assert, somewhat vaguely, that he was left to suffer alone, for "hours." However, the emergency room records show that it was not quite five hours from when jail staff discovered him in pain, in his cell, until he was *discharged* from the hospital at 9:50 a.m. Certainly it can be inferred that Weliever was in pain for some period of that time, and perhaps in considerable pain. However, the Eighth Amendment does not, and cannot, guarantee inmates a pain-free existence. Thus, deliberate indifference claims are not measured simply by the existence of an inmate's significant pain, but rather, by how jail staff respond to that pain. Here, there is no indication that Johnson (or any other member of the jail staff) were aware of Weliever's history of seizures and headaches prior to  April 23, 2014. Further, the record also indicates that Weliever received prompt and appropriate medical care after being found in his cell around 5:00 a.m. On the record here, a reasonable jury could not conclude that jail staff was deliberately indifferent to whether Weliever's need for medical treatment for his headaches and seizures.

### 2.     Post Emergency Room Care – April 23-25, 2014.

Next, Weliever argues that Johnson was deliberately indifferent to his serious medical needs in the days immediately following his return from the ER. Weliever's primary contention for this time frame is that Johnson failed to provide him with all of the

ibuprofen that had been prescribed by the emergency room doctor.

The Court has carefully reviewed the record in an attempt to discover what happened with respect to Weliever's ibuprofen dosages after he returned to the Jail from the emergency room on April 23, 2014. The medical record is somewhat murky, and the affidavits submitted by the defense do little to clarify what happened. Nevertheless, the entirety of the record viewed with all reasonable inferences drawn in favor of Weliever supports an argument that jail policy prevented Weliever from receiving the full course of ibuprofen that had been prescribed by the emergency room physician.

Specifically, as explained above, Weliever contends that the ER doctor wrote him a prescription which called for him to take 800 milligrams of ibuprofen three times a day. The written prescription supports this contention. (Dkt. 80-4 at ECF page 47). Although Weliever may have been limited to 200 milligrams twice a day, per jail policy, Johnson subsequently allowed Weliever to receive a dosage of ibuprofen greater than this amount. However, so far as the Court can discern from the records, even after Johnson intervened Weliever may never have received more than 1,600 milligrams of ibuprofen per day, even though the prescription had called for a total of 2,400 (in 800 milligram dosages three times a day). Thus, a reasonable jury could infer that, due to the existence of the jail policy on over-the-counter medications, Weliever may have received significantly less pain mediation than the doctor had ordered for a couple of days after his ER visit. A reasonable jury could also conclude that even after Johnson acted to override or change the policy on distribution of over-the-counter medicines in Weliever's particular case,

Weliever still did not receive the full dose of ibuprofen reflected in the ER doctor's prescription.

Ignoring or interfering with a prescribed treatment plan can be evidence of deliberate indifference. *See, e.g. Estelle v. Gamble,* 429 U.S. at 104-105; *See also, Robinson v. Doe, 2007 WL 3231585 (E.D. Cal. 2007).* Hence, the Court must carefully scrutinize any case alleging that an inmate was not provided medicine prescribed for him – even if the medicine in question was ibuprofen. Though ibuprofen is commonly available outside the prison context for minor aches and pains; here, the emergency room physician ordered that a certain dosage amount, larger than the ordinary over-the-counter dosage, was to be provided to Weliever to treat the pain from his severe headaches and a fractured rib. Further, the defense has not argued that there was any rational basis – correctional, medical, or otherwise – for not providing Weliever with the full amount of ibuprofen that the doctor had prescribed, despite Jail policy.

The question that remains, then, is whether a genuine issue of material fact exists as to whether the events of April 23 to 25, 2014 (interpreted so as to draw all reasonable inferences in favor of Weliever) rise to the level of deliberate indifference. The evidence described above must be considered against the general rule that even though inmates are entitled to adequate medical care, they are not entitled to the best care possible. *Forbes,* 112 F.3d at 267. Likewise, if a defendant's neglect of a prisoner's condition was an isolated occurrence, such a finding "ordinarily militates against a finding of deliberate indifference." *McGuckin ,* 974 F.2d at 1059-60 (9th Cir. 1992).

**MEMORANDUM DECISION AND ORDER - 14**

Here, while Johnson did take action to countermand Jail policy which capped the amount of ibuprofen that could be dispensed to an individual inmate, his change of that Jail policy limit still did not result in Weliever receiving the entire dosage of ibuprofen that had been prescribed for him by the emergency room physician. Rather, Johnson directed Jail staff to allow Weliever to receive the full 800 milligram prescribed dose, but only twice a day, rather than the three times a day that had been ordered. On those facts, certain reasonable inferences can be drawn in favor of Weliever. These are: (1) that Weliever's physician believed that the amount of pain Weliever was experiencing would require an 800 -milligram dose of ibuprofen three times a day to treat; (2) that the Jail staff first would only dispense 200 milligrams twice a day, as allowed for in Jail policy; (3) that after several days during which Weliever received only one-fourth the dose that had been ordered, Johnson changed the policy as to Weliever and ordered that he be given 800 milligrams twice a day so that he could save some of the medicine to use on an as needed basis; and (4) that for some period of time (even if only for several days), Weliever was in severe pain and was not provided the amount of pain medication prescribed for him to help him with that pain.

In making the decision as to whether such facts and inferences can support a claim of deliberate indifference, the Court also considers the evidence indicating that, in other respects, Weliever received prompt and appropriate attention for his medical problems while he was housed at the Jail. He was always provided with his anti-convulsant medication. He was seen by medical staff whenever he raised a new medical concern. He

was taken to the ER on several occasions, not just during April but during May, June, and July of 2014 when his seizure and headache condition required a physician's attention. (Bell Affidavit, Dkt. 80-1 at ¶¶ 14-23). Medical staff saw him regularly for various issues, including the seizures and headaches, and continued to see him on a regular basis until his custody was changed to the Idaho Department of Correction in December of 2014. (*Id.* at ¶¶ 14-25). Weliever also was provided with non-narcotic pain medications as needed, including ibuprofen and Pain Off, throughout his stay. (*Id.* at ¶ 7). While it is evident that Weliever believes he was treated badly at the Jail, he does not explain how his medical care was inadequate or suggest what specific treatment he should have received, other asserting that he did not get the full amount of ibuprofen prescribed over a several day period, and that he did not receive prompt attention on the morning of April 23, 2014.

There is no question but that the Jail policy limiting the amount of over-the-counter ibuprofen conflicted with the emergency room physician's orders. However, nothing in the record indicates that this disconnect was the result of deliberate attempt to interfere with Weliever's care, as opposed to an occurrence that was the result of an unusual and unexpected confluence of factors. To begin with, it is not surprising that Jail staff would follow the directives of the Jail policy unless and until directed by a superior to do otherwise. That unnamed or unknown correctional officers may have denied Weliver access to the full amount of ibuprofen that had been prescribed is not evidence of deliberate indifference to his condition, or an attempt to interfere with his care, and

certainly not on the part of Johnson, who is the only remaining defendant in this case. At most, these events are evidence of mindless bureaucratic adherence to protocol in the face of an unfamiliar or unanticipated turn of events. When Johnson became aware of the issue, he effectively changed the policy as it pertained to Weliever – making an exception, as it were, to the general rule. The record does indicate that Johnson may have changed the policy so as to only allow Weliever to receive 800 milligrams (the prescribed dose) only two times a day rather than three times a day as called for by the emergency room discharge order. But that anomaly, which is unexplained in the record, does not suggest that Johnson deliberately sought to interfere with Weliever's care. To reach that conclusion, a trier of fact would have to conclude that Johnson recognized the necessity of changing the Jail policy as to Weliever but that he also, in the same stroke, sought to undermine his own order by in effect declaring that Weliever could only receive the prescribed dose of ibuprofen two times per day instead of three. Further, Johnson's explanation for the change of over-the-counter medication policy as to Weliever (i.e. that he changed the policy so that Weliever could get 800 milligrams of ibuprofen in each dose and save some to take on an as needed basis) belies such an interpretation. At most, the record suggests that there may have been confusion about the total amount of ibuprofen that Weliever was to receive per the emergency room discharge order. Nothing in the record suggests that Johnson deliberately intended to limit Weliever to a lesser amount. Rather, the record viewed as a whole, indicates that Weliever was getting prompt and continual attention for his headaches, seizures, and other medical conditions, not only

during the specific time frames at issue in this motion, but also throughout the summer and fall of 2014. In the context of the record as a whole, the fact that Weliever may not have gotten the full amount of ibuprofen that had been prescribed stands out as an anomaly, but not one that rises to the level of deliberate indifference.

**3.     May 14, 2014 Meeting Regarding Kites**

The Court also considers Weliever's claim that Johnson interfered with his medical care by telling him to stop submitting kites about his headaches and seizures. Weliever contends that during the meeting he had with Johnson on May 14, 2014, Johnson told him not to submit any more medical kites or he would be "thrown in the hole," or else written up. (Weliever Depo. Dkt. 80-12 at p. 73). Weliever also testified that after this meeting, another correctional officer told him that, if he were in Weliever's position, he would not put in any more kites related to a seizure or migraine headaches. (*Id.* at p 75). Johnson says in his affidavit, on the other hand, that he only meant to convey to Weliever that he should stop raising issues that had already been addressed, not that Weliever could not submit any more concern forms about new medical issues. While Johnson's explanation is plausible, Weliever's testimony does create an issue of fact as to the intended purpose of Johnsons' words.

However, even if an issue of fact exists on this point, for Weliever to proceed to trial on a deliberate indifference claim he still must prove that Johnson made comments or issued instructions that could plausibly be interpreted as an attempt to interfere with Weliever's ability to receive medical care, and that these actions actually did prevent

Weliever from receiving necessary care during his stay at the Jail. Yet, Weliever has not even argued that he was denied adequate medical care for his headaches and seizures after the May 14, 2014 meeting regarding the kite process. And, as explained above, far from suggesting that Jail medical staff was ignoring Weliever, the record actually indicates that he received prompt and adequate medical care for his headaches, seizures, and other medical conditions throughout the time he was incarcerated at the Jail. On such a record, the theoretical possibility that Johnson meant something more sinister by his comments about Weliever's use of the kite process is not enough to create a genuine material issue of fact on the aspect of the deliberate indifference claim stemming from the May 14, 2014 meeting about grievances.

### 4. Jail Grievance Procedures

Weliever's final issue relates to the Jail grievance procedures. According to Weliever, the Jail handbook specified that appeals from denials of grievances were to be addressed by the county sheriff, who did not have much to do with the day-to-day workings of the Jail. In practice, according to Weliever, authority over most jail matters–including grievance appeals–had been delegated to Johnson as the jail administrator. Weliever contends that this de facto alteration in the "chain of command" effectively allowed Johnson to be the judge of his own actions.

Even if the circumstances described by Weliever were the de facto method of handling prisoner grievance at the Jail, a deviation from written jail policies does not, by itself, establish a constitutional violation on which Weliever can proceed in this case.

**MEMORANDUM DECISION AND ORDER - 19**

Under the PLRA (the "Prison Litigation Reform Act"), inmates must exhaust all

applicable internal grievance procedures before bringing a lawsuit in federal court.

However, there is no inherent constitutional right to a particular jail or prison grievance

process. 42 U.S.C. § 1997e, *et seq. See also, Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.

1988) ("there is no legitimate claim of entitlement to a grievance procedure"). It follows,

then, that there is no independent constitutional claim challenging governmental

interference with an inmate's use of the grievance procedure. *See Albino v. Baca*, 747

F.3d 1162, 1172-73 (9th Cir. 2014) (en banc).

For all these reasons, Weliever has failed to establish that a genuine issue of

material fact exists as to any of his discrete claims of deliberate indifference.

### 5.     State Law Negligence Claims

Finally, the Court addresses Weliever's state law negligence claims with respect to

his medical care. Although in an early order the Court permitted Weliever to  proceed

with such claims, (See Dkt. 21 at p. 2 & 5), that ruling did not relieve Weliever of his

responsibility to support such claims against a motion seeking to have them dismissed

before trial. Weliever has not done so and his still inchoate negligence claim is subject to

dismissal on that basis alone. But, additionally, his negligence claim has no legal footing

against Johnson because Johnson is a deputy sheriff, not a medical care provider.

Johnson had no doctor-patient relationship with Weliever; therefore, he owed Weliever

no duty beyond that which the Eighth Amendment requires.

Finally, even if some plausible negligence claim could be asserted by Weliever

against Johnson, on this record the Idaho Tort Claims Act ("ITCA") provides Johnson with immunity from such claims, because under any view of the record, Johnson's actions were made "without malice or criminal intent and without gross negligence or reckless, willful and wanton conduct." *See,* I.C. § 6-904B. As to gross negligence and recklessness, this Court has recognized that the ITCA's standards are essentially the same as the standards for proving deliberate indifference. *See,* Idaho Code 6-904C*; See also, Van Orden v. Caribou County,* 2014 WL 5178095 at *9 (D. Idaho 2014). Accordingly, for the reasons described elsewhere in this Decision, the Court's finding that no deliberate indifference exists also forecloses Weliever from arguing that Johnson was guilty of gross negligence or recklessness. Further, even if Weliever were to contend that some ill intent or malice can be inferred from Johnson's statements to Weliever during the May 14, 2014 meeting, Weliever has failed to demonstrate that the jail failed to provide him with any necessary medical care after that meeting. Any remaining negligence claims would fail on causation grounds, as do the deliberate indifference claims stemming from the May 14 meeting. For all these reasons, Weliever's state law claims must also be dismissed.

## ORDER

For all the foregoing reasons, the Defendant's Motion for Summary Judgment (Dkt. 80) is **GRANTED.** A judgement is being issued as a separate document. As soon as

that Judgment issues, the Clerk of the Court is directed to close the case.



DATED:  **September 18, 2017**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge